MARTHA WEATHERS, PLAINTIFF-APPELLANT, v. HARTFORD INSURANCE GROUP *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued April 24, 1978—Decided July 26, 1978.

*Mr. Edward J. Brady* argued the cause for appellant.

*Mr. Michael Daily, Jr.,* argued the cause for respondents (*Messrs. Montano, Summers, Mullen and Manuel,* attorneys).

The opinion of the court was delivered by

PASHMAN, J.  Plaintiff Martha Weathers purchased a standard New Jersey automobile insurance policy from defendant Hartford Insurance Group, the insurance carrier to whom her coverage had been assigned by the New Jersey Automobile Insurance Plan ("the Plan") in 1972. This coverage was obtained for her by defendant Don Still Agency, Inc., an independent insurance broker ("the broker"), through whom she submitted her application to the Plan. Her policy was renewed for a second one-year period from October 30, 1973 to October 30, 1974 with an annual premium of $261.00 Plaintiff elected to pay the renewal premium in three installments — 40% payable on the renewal date, 30% payable ninety days thereafter, and the final 30% payable in another ninety days, on April 30, 1974.

Plaintiff subsequently failed to pay her final premium installment of $78.30 in a timely manner. Previously, when the payment for the second installment had not been made by the required date, Hartford had sent plaintiff a notice advising her that her policy would be cancelled for non-payment of premium effective February 25, 1974. Plaintiff made the delinquent payment to the broker on February 13, 1974. Hartford thereafter sent the insured a notice informing her that her policy had been reinstated without lapse in coverage. Hartford contends that it mailed plaintiff a similar notice of cancellation on May 10, 1974 advising her that her policy would be cancelled effective at 12:01 a.m. on May 22, 1974. Plaintiff denied receipt of any such notice. Hartford relies on a certificate of mailing bearing plaintiff's name and address, a stamp, and a postmark for

May 10, 1974, together with evidence of its standard procedures, as proof that plaintiff was so notified. Plaintiff failed to pay the premium by the date specified in the notice. On May 23, 1974 she delivered a cash payment of the installment amount to the broker, who accepted the money without any mention of a cancellation problem and gave her a receipt therefor. The following day plaintiff was involved in an automobile accident in which she sustained personal injuries. She informed the broker of the accident that same day.

After receiving plaintiff's delinquent payment, the broker had immediately issued his own check for the amount of the premium installment and forwarded it to Hartford that same day. However, Hartford refused to accept the broker's check because it was dated subsequent to the May 22, 1974 date Hartford had chosen as the effective date of cancellation for plaintiff's policy. The policy was not reinstated and coverage for plaintiff's accident was declined. Hartford refunded to plaintiff the premium monies ($59.40) she had already paid which were unearned (calculated on a *pro rata* basis, see *N. J. A. C.* 11:3–1.19) as of the date coverage under the policy terminated. Plaintiff refused to accept the premium refund from Hartford and later instituted this action in the Chancery Division seeking a judgment declaring that coverage existed under the policy for her accident and requiring Hartford to provide her with Personal Injury Protection benefits mandated by *N. J. S. A.* 39:6A–4.[1]

At the trial below, the only witnesses were Weathers and the Hartford official who supervised all New Jersey assigned risk policies. Plaintiff testified concerning her non-receipt of any of the notices relating to the potential cancellation of her policy. The Hartford official described the company's customary billing, cancellation and mailing procedures for its

---

[1]The broker was also named as a defendant but never appeared in the action, resulting in the entry of a default.

installment payment policies and, reading from plaintiff's file, stated that her policy had been handled in conformity with those procedures. A major focus of his testimony, which is summarized in detail in the opinion of the Appellate Division, 153 *N. J. Super.* 563, 565–566 (App. Div. 1977), was the significance of Hartford's certificate of mailing in establishing that the required notification of cancellation had been given. The trial judge was apparently satisfied with Hartford's proof that it had mailed the notice of cancellation, but nevertheless credited plaintiff's testimony that she never received such a notice and accordingly held that the purported cancellation of her policy was ineffective. He held in the alternative that plaintiff's payment of the final installment premium to the broker on May 23, 1974 and his acceptance thereof was binding on Hartford pursuant to *N. J. S. A.* 17:22–6.2a and kept the policy in force. Hartford was ordered to provide coverage to plaintiff and to pay her costs and counsel fees.

On Hartford's appeal from that judgment, a unanimous Appellate Division reversed, holding that the policy had been effectively cancelled on May 22, 1974. The court held that Hartford's certificate of mailing for its cancellation notice was, in combination with the evidence of its cancellation procedures, adequate proof of mailing for purposes of *N. J. S. A.* 17:29C–10. The court noted that for notice to be effective, the statute requires only proof that the notice was mailed to, not received by, the insured. Thus, plaintiff's claim of non-receipt of the notice of cancellation was legally irrelevant to the validity of the cancellation. The court also ruled that *N. J. S. A.* 17:22–6.2a was not applicable where a policy had been effectively cancelled prior to a broker's receipt of a premium installment payment from an insured. Thus, it held that the broker's acceptance of plaintiff's payment on May 23, 1974 was of no legal significance with respect to Hartford's liability under the policy. We granted plaintiff's petition for certification, 75 *N. J.* 603 (1978), and now reverse the Appellate Division's holding that Hartford

had proven as a matter of law that plaintiff's policy had been validly cancelled.

I

Pursuant to *N. J. S. A.* 17:29C–7, an insurer may issue a notice of cancellation of an automobile insurance policy because of the insured's "nonpayment of premium," defined in *N. J. S. A.* 17:29C–6(F) as the

\* \* \* failure of the named insured to discharge when due any of his obligations in connection with the payment of premiums on a policy, or any installment of such premium, whether the premium is payable directly to the insurer or its agent or indirectly under any premium finance plan or extension of credit.

To be effective, a notice of cancellation specifying non-payment of premium as the reason therefor must be mailed or delivered by the insurer to the named insured at least ten days prior to the effective date of cancellation. *N. J. S. A.* 17:29C–8. The statute relevant for present purposes provides that

Proof of mailing of notice of cancellation \* \* \* to the named insured at the address shown in the policy, shall be sufficient proof of notice.

[*N. J. S. A.* 17:29C–10]

These rules apply to assigned, risk policies issued under the auspices of the New Jersey Automobile Insurance Plan, *see N. J. A. C.* 11:3–1.19, with the proviso that "a notice of cancellation for non-payment of premium shall not be effective if payment of the amount due is made prior to the effective date of such notice." *New Jersey Automobile Insurance Plan Manual* § 19.(A)(1).

The policy of insurance Hartford issued to plaintiff contained the following cancellation provision:

\* \* \* This policy may be canceled by the company by mailing 'to the named insured at the address shown in this policy written notice

stating when not less than ten days thereafter such cancelation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. * * * [T]he effective date and hour of cancelation stated in the notice shall become the end of the policy period. * * *

As is apparent, the policy language substantially conforms to the applicable statutory requirements.

■ Hartford contends that its certificate of mailing established "proof of mailing" for purposes of *N. J. S. A.* 17:29C-10 and constitutes conclusive proof that it provided plaintiff with the notice of cancellation required to make its cancellation effective. We agree with the Appellate Division that under *N. J. S. A.* 17:29C-10 cancellation may be effective whether or not the insured has actually received the notice of cancellation since proof of mailing, not proof of receipt, is the determinative factor. *See* 153 *N. J. Super.* at 568. Consequently, evidence that the insured never received the notice of cancellation is not relevant to a material issue when introduced for the purpose of proving that fact.

We read the statutory language "[p]roof of mailing of notice of cancellation * * * shall be sufficient proof of notice," to mean that actual mailing of the cancellation notice suffices to establish notice. In other words, the statutory prerequisite to a valid cancellation is the mailing to the insured of a notice of cancellation providing the insured with the minimum notice specified in *N. J. S. A.* 17:29C-8. It is the function of the fact-finder to determine whether such mailing has occurred. Of course, in accordance with normal procedure, the judge may take this issue from the fact-finder where the proofs are so conclusive as to establish mailing of non-mailing of the notice as a matter of law.

■ We agree with plaintiff's contention that in the present case defendant's proofs were insufficient to establish mailing of the cancellation notice as a matter of law. Thus, we reverse the contrary holding of the Appellate Division. The question of mailing was an issue of fact to be resolved by the trial judge. The judge never made a finding of fact thereon.

Our determination that mailing was not established conclusively is based upon a number of factors affecting the weight of defendant's proofs. The postal clerk who stamps the certification of mailing does not examine the contents of the envelope purportedly containing the notice. The single supervisory official who testified for defendant in this case did not indicate personal knowledge as to individualized review of the envelopes by a postal clerk before the postmark is affixed. Evidence from personnel in defendant's organization charged with mailing notices and from postal employees as to their verification of the contents of mailed envelopes would have established a stronger case of mailing than what defendant adduced. Defendant's witness conceded it was possible that a given envelope might not contain a notice to the person purportedly addressed. Thus, while defendant's proof of mailing was sufficient to go to the fact-finder on the issue, it did not compel a finding of mailing as a matter of law.

As no express finding as to mailing was made by the trial judge, a remand of the case for a determination of that question is necessary. In that regard, contrary to the holding of the Appellate Division, we conclude that testimony by the addressee-insured that she never received the notice of cancellation is admissible for the purpose of refuting the hypothesis of mailing.

Although the inference of non-mailing provided by evidence of non-receipt might in most cases be outweighed by the inferences of mailing which may be drawn from a certificate of mailing whose reliability has been established, we discern no cogent reason for depriving the trier of fact of such evidence by holding it inadmissible even for that limited purpose. While, as we have held above, defendant's proofs as to mailing are admissible, they are not conclusive of that issue and do not preclude the existence of a genuine issue of material fact in the face of a claim of non-receipt so as to entitle the insurer to judgment as a matter of law. *See Sudduth v. Commonwealth County Mutual Ins. Co.,* 454

*S. W.* 2d 196 (Tex. Sup. Ct. 1970); 9 *Wigmore on Evidence* (3d ed. 1940) § 2519; *cf. Fitzpatrick v. Merchants and Manufacturers Fire Ins. Co.,* 122 *N. J. L.* 468 (E. & A. 1939). The contrary holding of *Womack v. Fenton,* 28 *N. J. Super.* 345 (App. Div. 1953), on this point is hereby overruled. Permitting the factfinder to consider the addressee-insured's denial of receipt of the notice of cancellation does not improperly add to the insurer's statutory burden of proving mailing by requiring it to prove actual receipt of the notice since such testimony is admissible only as the basis for an inference of its non-mailing. The insurer still need only prove constructive notice by adequately establishing that the notice of cancellation was mailed.

We accordingly reverse the judgment of the Appellate Division on this point and remand the case to the trial court for further proceedings consistent with this opinion. Its judgment as to the inapplicability of *N. J. S. A.* 17:22–6.2a under the circumstances of this case is affirmed substantially for the reasons stated below.[2]

---

[2]We note that notwithstanding the alleged inapplicability of that statute, after a policy has been effectively cancelled, representations to the insured made by the insurer itself may be sufficient to bind the insurer where a broker accepts a premium payment after cancellation. In the instant case, the insurer's "installment reminder notices" sent to the insured advised, without any qualification, that "Payment to the Broker constitutes payment to the Company." Although this language correctly states the law as embodied in *N. J. S. A.* 17:22–6.2a and its inclusion in the billing notice seems mandated by the Plan, *see* § 15(B)(1) thereof, it does not clearly and unmistakably advise the insured that the insurer will take the position that payment to the broker does not bind the company when it is made after the cancellation effective date. However, since the insured herein denied receiving any such notice, as well as the notice of cancellation, we have not considered the effect of this imprecise language on the reasonableness of any expectation an insured might have that payment to his broker would operate to prevent cancellation of his policy. *Cf. Bonnet v. Stewart,* 68 *N. J.* 287 (1974).

## II

The following expresses the views of this writer and of the Chief Justice.

Under the Installment Premium Payment Option of the New Jersey Automobile Insurance Plan, the final installment of 30% of the total annual premium of plaintiff's policy was payable to the insurer by the end of the sixth month after the inception date of the policy. *N. J. A. C.* 11:3–1.15 (a)(1); *New Jersey Automobile Insurance Plan Manual* § 11(A)(2). When plaintiff failed to make the required payment by its April 30, 1974 due date, Hartford acquired the right to cancel her policy for nonpayment of premium. *N. J. S. A.* 17:29C–6(F), –7(A)(a). Hartford has chosen, apparently for reasons of administrative convenience, to afford its insureds a seven day grace period beyond the installment due date for the receipt of the delinquent payment before the cancellation process is initiated. In plaintiff's case, the cancellation process took some three days, as her file was marked as unpaid on May 7, 1974 and the issuance of a cancellation notice did not occur until May 10, 1974. In addition to the ten day minimum notice of cancellation required by statute for cancellations resulting from nonpayment of premium, Hartford has chosen to provide two additional days' notice, a period sufficient, in its view, to allow for mailing delays. The cancellation notice prepared by Hartford for plaintiff's policy stated that coverage under the policy would terminate twelve days after the date of issuance of the cancellation notice. The selection of May 22, 1974 as the effective date of cancellation was thus the result of the combination of Hartford's internal administrative practices and the fortuity that its clerical personnel happened to reach plaintiff's policy for cancellation processing and the issuance of the cancellation notice on May 10, 1974 instead of some earlier or later date. Pursuant to the Plan, if plaintiff had paid the premium installment due on her policy prior to the effective date of cancellation specified in the cancellation

notice, no termination of coverage would occur. *See New Jersey Automobile Insurance Plan Manual* §19(A)(1), quoted *ante* at 233.

Aside from the minimum ten days' notice which is a statutory prerequisite to a valid cancellation, the selection of the date upon which coverage under an automobile insurance policy cancelled for nonpayment of premium will terminate is rather astonishingly left completely to the discretion of the insurer. There are no statutory or regulatory provisions governing the determination of the effective date for such a cancellation. The insurer's selection of an effective date for the termination of coverage is limited only by the requirement that ten days' notice of cancellation be given. *N. J. S. A.* 17:29C–8. Hartford chose, with some element of randomness, to cancel plaintiff's policy for nonpayment of the April 30, 1974 premium installment effective May 22, 1974. Because of the "front-end loading" of the Plan's premium payment scheme, the termination of coverage on that date generated a return premium payable to plaintiff representing the *pro rata* portion of the 70% of her total annual premium already paid which the insurer did not earn because of the cessation of coverage on May 22, 1974. Hartford conceded at oral argument that the amount of the unearned premium refunded to plaintiff was sufficient for the insurer to have provided the coverage afforded by her policy well beyond the May 22, 1974 effective date of cancellation. The return premium far exceeded the amount of premium which would have been necessary to extend coverage according to the policy to May 24, 1974, the date of plaintiff's accident. The unearned premium refund was in the amount of $59.40; the amount of premium which the insurer would have earned for the two additional days of coverage is approximately $3.15.

We find it nothing short of unconscionable for an insurer to cease providing coverage for which it has already been paid on an arbitrarily selected date prior to the date on which the premium monies in its hands would be exhausted by being

fully earned. While the insurer's right to cancel because of the insured's default with respect to the timely payment of the additional premium installment necessary for coverage to exist for the full policy period is established by *N. J. S. A.* 17:29C–6(F), the statute does not specify when that cancellation may take effect. *N. J. S. A.* 17:29C–8 mandates that where a policy is cancelled for nonpayment of premium the insurer must provide a *minimum* of ten days' notice to the insured. It sets no *maximum* notice period within which coverage must terminate such as would preclude an insurer from utilizing a notice period coextensive with the remaining period of coverage for which the insured has already paid the necessary premium. With respect to assigned risk policies, the applicable regulation states only that "Cancellation shall be effective on the date specified [in the notice of cancellation] and coverage shall cease on such date," *N. J. A. C.* 11:3–1.19(e), and leaves the choice of that date to the insurer.

By selecting an effective date of cancellation prior to the last full day to which coverage could extend before the premium earned would exceed the premium in its hands, the insurer has acted in a manner injurious to the right of its policyholder to receive the benefits of the insurance contract and thus plainly inconsistent with its fiduciary duty to deal with its insured fairly and in good faith. *Bowler v. Fidelity and Casualty Co. of N. Y.*, 53 *N. J.* 313, 327 (1969). In New Jersey today the interests of an insured in possessing automobile insurance coverage for the maximum amount of time for which he has paid a premium are compelling. In its absence, he is exposed to the potential of significant criminal and administrative sanctions,[3] substantial civil liability and the possibly devastating consequences of

---

[3] *See, e. g., N. J. S. A.* 39:6B–2.

a lack of the first party personal injury protection benefits which are mandatory in this State. Similarly weighty is the public interest that an individual possess the financial protection and responsibility provided by insurance coverage. The interest of the insurer in selecting an earlier time for cancellation of the policy to be effective — mainly that of administrative expedience — is featherweight in comparison. The insurer is being asked only to provide that for which it has already received adequate consideration — coverage under the policy to the full extent of the premium paid. Neither its right to terminate coverage when that point is reached nor its initial right to cancel the policy for nonpayment of the remaining premium due would be affected.

. We find something inherently inequitable in allowing an insurer to terminate present coverage for which it has already been paid on the ground that it has not yet been paid for future coverage which it is not yet obliged to provide. This Court's settled policy in the area of automobile insurance has been to approach problems of coverage with a liberality intended to effect "the broadest protection of auto accident victims consistent with the language of the pertinent statute[s]." *Motor Club of America Ins. Co. v. Philips,* 66 *N. J.* 277, 293 (1974). Where no statutes control a particular issue, its disposition must be guided by the paramount public policy of this State that victims of automobile accidents be assured of "adequate indemnification" wherever appropriate. *Id.* at 292; *Motor Club Fire & Casualty Co. v. N. J. Manu. Ins. Co.,* 73 *N. J.* 425, 433, 438 (1977). Our assessment of the respective interests of insurers, insureds and society in the choice of the date upon which coverage under a policy cancelled for nonpayment of premium will terminate prompts us to urge the Commissioner of Insurance to adopt a regulation which would prohibit an insurer from selecting as the effective date of cancellation a date prior to the last full day to which

coverage could extend under the premium already paid, calculating the earned premium on a *pro rata* basis.[4]

The interest of insurers in avoiding the administrative nightmare such a rule will allegedly create is insubstantial in comparison to the countervailing interests of insureds and society in avoiding the potentially ruinous results of an absence of the financial security afforded by insurance coverage. Moreover, we do not consider increased administrative burdens as something to be avoided at all costs when their imposition is an incidental effect of remedying the inequitable state of affairs which the insurer, through its present business practices, has itself created.

The fact that the operating rules of the Plan and the administrative regulations governing assigned risk policies provide for a refund of unearned premium upon a cancellation by the insurer, which suggests that previous premium payments would remain in the insurer's hands as of the effective date of cancellation, does not sanction the practice we have condemned herein. *See New Jersey Automobile Insurance Plan Manual* § 19; *N. J. A. C.* 11:3–1.19(b), (c). The administrative solution we contemplate would be equally applicable to non-assigned risk automobile policies and would not derive from any peculiar need of assigned risk insureds for protection against the premature termination of coverage upon a cancellation for nonpayment of premium. We believe that the cited provisions are far too tenuous a basis for finding any administrative authorization for terminating coverage for which an insured has already paid.

Under the regulation governing the installment payment plan for assigned risk policies, paid premiums must at all

---

[4]Such a rule would, of course, apply only to the cancellation, pursuant to *N. J. S. A.* 17:29C–7, of an automobile insurance policy for nonpayment of premium to an insurer and not to the other possible bases for cancellation action by the insurer authorized by *N. J. A. C.* 11:3–1.19 or § 19 of the Plan.

times equal or exceed the premium earned by the insurer, calculated on a short rate basis, from the inception date of the policy to the due date of the next premium installment. *N. J. A. C.* 11:3–1.15(a)(6). The cited regulation is not part of the regulation (*N. J. A. C.* 11:3–1.19) governing the cancellation of assigned risk policies. Nevertheless, Hartford asserts that the purpose of this rule is to enable the insurer to always have sufficient premium in its possession to enable it to collect its short rated premium charge in the event the insured himself requests cancellation. *See N. J. A. C.* 11:3–1.19(a). Hartford argues that since earned premium when calculated on a short rate basis exceeds earned premium when calculated on a *pro rata* basis, the premium in the possession of the insurer would be fully earned on a short rate basis on a date prior to that on which it would be fully earned on a *pro rata* basis — the latter date being the earliest date for an insurer's termination of coverage pursuant to a cancellation for nonpayment of premium under our proposed rule. Hartford further argues that if the insured whose policy was being cancelled for nonpayment of premium as of the latter date should himself request cancellation of his policy subsequent to the date on which the prepaid premium would be fully earned on a short rate basis, an insurer would be "faced with the burden of attempting to collect a small premium amount for prior coverage."

The combination of *N. J. A. C.* 11:3–1.15 and the problem hypothesized by Hartford suggest that it might be appropriate to permit an insurer, at least in the case of assigned risk policies, to make a *pro rata* cancellation for nonpayment of premium effective as of the date on which the prepaid premium would be fully earned if calculated on a short rate basis. However, the vice of having policy coverage terminate prior to the last full day to which it could extend under the premium already paid would not be eliminated. Moreover, we discern no legitimate justification for treating persons who are forced to secure automobile insurance cover-

age on an assigned-risk basis, and who elect to pay their premium in installments, as second-class citizens simply by reason of this rule. We note that the number of persons considered assigned risks has increased, since that category now includes many persons who are merely predictively, as opposed to demonstrably, poor insurance risks on the basis of having below par driving skills.

No comparable rule protects insurers from the potential defalcations of preferred risk insureds in a similar situation — they are as much likely as assigned risk insureds to cause collection problems for insurers if their cancellation request entitles the insurer to the seeming bonanza of a short rated earned premium. We can see no justification for denying an entire class of insureds the benefit of a salutary rule concerning cancellation for nonpayment of premium dictated by equity and public policy merely because they, unlike their preferred risk brethren, have the misfortune of finding themselves to be assigned risks and consequently subject to a rule intended to protect the interests of an insurer in the event of an entirely unrelated type of policy cancellation.

The highly speculative possibility that an insured whose policy was to be cancelled as of the *pro rata* cancellation date might request cancellation at some time after the date on which the premium already paid would be fully earned under a short rate calculation, is not sufficient justification for continuing to permit insurers to exercise untrammeled discretion in determining when coverage under a policy cancelled for nonpayment of premium shall terminate. Even assuming an insured did so, the insurer would at worst suffer a "paper" loss of the differenec between the full *pro rata* earned premium already in its hands and the slightly higher short rated earned premium to which it would be entitled as of the date cancellation was requested. The difference would be the greatest if cancellation were to be requested by the insured on the same day the policy coverage was to terminate by reason of a cancellation for nonpayment of premium. An assigned risk insured whose policy is cancelled for nonpay-

ment of the third premium installment of 30%, as was plaintiff herein, has already paid 70% of the total annual premium on the policy and, under our holding herein, could not be cancelled until that 70% of the total premium was fully earned on a *pro rata* basis — *i. e.,* the *pro rata* cancellation factor would be 70% on the date coverage terminates. The short rate cancellation factor for that same day would be 77%. Similarly, an insured who defaults on the second installment payment has paid 40% of the total annual premium and coverage could not terminate until that 40% was fully earned. The corresponding short rate factor to a 40% pro rata factor is 50%. Thus, depending on the installment whose nonpayment is the basis for cancellation, the insurer could sustain a maximum *paper* loss of either 7% or 10% of the total annual premium. When compared to the grievous loss an insured could sustain because of an unnecessarily premature termination of coverage, the potential plight of the insurers, who face only the remote possibility of being deprived of the added profit of a short rated cancellation, pales into insignificance.

It may be argued that the rule we advocate would completely frustrate the purpose of the installment payment scheme of the Plan by unwarrantedly extending the grace period within which the insured can effectively invalidate the cancellation by tendering the delinquent installment prior to the coverage termination date. This allegedly would encourage insureds to ignore the scheduled installment payment dates and create unnecessary administrative burdens for assigned risk insurers. The short answer to this argument is that the insurers will be in no worse a position with respect to undesired policy reinstatements under our suggested rule than they are at present under the current reinstatement rule of the Plan. See *ante* at 240–241. Such involuntary reinstatements will increase only for those insurers who have chosen to rid themselves quickly of unwanted assigned risks by terminating coverage upon a cancellation for nonpayment of premium as soon as possible after the insured's default.

As we have mentioned, see *ante* at 241–242, an assigned risk insurer could, under the Plan, have voluntarily chosen as the effective date of cancellation the date which we believe it should be required to utilize. Our suggested rule would have no effect on the incidence of involuntary reinstatements for such an insurer. And we must emphasize again that the fundamental inequity of sanctioning the termination of coverage otherwise paid for outweighs any administrative inconvenience that insurers might be forced to endure in a small minority of cases. The paramount importance of possessing automobile insurance coverage in New Jersey precludes any other approach to this issue.

We commend our observations on this score to the Commissioner of Insurance for his appropriate consideration. His promulgation of an administrative rule consistent with the views we have expressed would remedy this unwarranted gap in the otherwise comprehensive regulation of the automobile insurance industry in the public interest in this State. The significant potential for injustice resulting from this regulatory omission makes such action imperative.

*For reversal and remandment*—Chief Justice HUGHES, Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER and Judge CONFORD—7.

*For affirmance*—None.