**In the Matter of PRITCHARD & BAIRD, INC., Pritchard and Baird Intermediaries Corporation, both corporations of the State of New York, P & B, Inc., P & B Intermediaries Corporation, C & W Financial Corp., Newark Reinsurance Management Corp., all corporations of the State of New Jersey, Bankrupts.**

**HARTFORD FIRE INSURANCE COMPANY, a corporation, Hartford Accident and Indemnity Company, a corporation, and Hartford Casualty Insurance Company, a corporation, Plaintiff-Appellant,**

v.

**John J. FRANCIS, J. Raymond Berry, Hugh P. Francis, Trustees of Pritchard & Baird, Inc. et al., Defendants-Appellees.**

**Bankruptcy No. CA 80–2405.**

United States District Court,
D. New Jersey.

Nov. 20, 1980.

tingent claims which are disallowed, thereby protecting these claims from discharge.

Raymond J. Lamb, Lamb, Hutchinson, Chappell, Ryan & Hartung, Jersey City, N. J., for Hartford Fire Ins. Co.

Benjamin N. Cittadino, Pellettieri, Rabstein & Altman, Trenton, N. J., for California Union Ins. Co.

Seymour J. Ugelow, Rein, Mound & Cotton, New York City, for Burt & Scheld, Inc.

Hugh P. Francis, Francis & Berry, Morristown, N. J., for Pritchard & Baird, Inc.

Steven S. Radin, Sills, Beck, Cummis, Radin & Tischman, Newark, N. J., for Fortress Re., Inc. and Calvert Fire Ins. Co.

Gerald C. Kelly, Hooley, Perselay, Butter & Kelly, Westfield, N. J., for Skandia America Reinsurance Corp.

## OPINION

WHIPPLE, Senior District Judge.

This is an appeal by Hartford Fire Insurance Company and Hartford Accident and Casualty Company (hereinafter Hartford) from a declaratory judgment entered by the Bankruptcy Court on April 25, 1980 (Bank-

ruptcy No. B 75–3202). The Court determined that Pritchard and Baird, Inc., (hereinafter P&B) acted as the agent of Hartford in connection with reinsurance placement.

The bankrupt, P&B,[1] was a reinsurance intermediary or broker.[2] In this role, P&B received premiums from Hartford to be paid on policies issued by the reinsurers.[3] However, P&B failed to transmit to the reinsurers the premiums forwarded from Hartford.[4]

Resolution of P&B's role in this matter is of the utmost importance to all parties, especially the trustees and the bankrupt estate. If P&B was the agent of the ceding insurers,[5] such as Hartford, then the ceders have a claim against the assets of the bankrupt estate for the premiums transmitted to P&B but which were never disbursed to the reinsurers. A number of ceders have filed such claims with the trustees.

On the other hand, if P&B was in fact the agent of the reinsurers, it would follow that Hartford's payments to P&B of the reinsurance premiums due would constitute payment to the reinsurers. As a result, the reinsurers would have a claim against the bankrupt estate for the amount of the premiums. A number of the reinsurers have also filed such claims. Consequently, the trustees of P&B have been presented with duplicate claims for the same monetary obligation.

In order to solve this dilemma, the Bankruptcy Court declared that P&B was the

---

1. On December 2, 1975, P&B filed a petition for arrangement under Chapter XI of the Bankruptcy Act. Thereafter, on January 28, 1976, P&B was adjudicated bankrupt.

2. A "Reinsurance broker" is defined as "a solicitor of reinsurance who does not represent reinsurance companies and is employed by the ceding company (reinsured) to place reinsurance on its behalf with markets of his choice, or as designated by the ceding company."

   An intermediary is defined as "a reinsurance broker who negotiates contracts of reinsurance on behalf of the reinsured, usually with those reinsurers who recognize brokers and pay them commissions on reinsurance premiums ceded . . ." *General Reinsurance Co. Glossary of Reinsurance Terms*, republished, *The National Underwriter*, March 13, 1964.

3. The following acted as reinsurance managers in this matter:
   A. Fortress Reinsurance Managers, Inc.
   B. Skandia America Reinsurance Corp.
   C. Burt and Scheld, Inc.
   D. California Union Insurance Co.
   E. Allstate Insurance Co.
   F. Agency Managers, Inc.

   Reinsurance is the transaction whereby the reinsurer, for a consideration, agrees to indemnify the ceding company (reinsured) against all or part of the loss which the latter may sustain under the policy or policies which it has issued. *General Reinsurance Co. Glossary of Reinsurance Terms.*

   Reinsurance transactions or agreements come into being when an original insurer decides that it has more insurance risks than it wishes to retain in its portfolio and then transfers a portion of its risks to other insurance companies who are then known as the reinsurers. Where an original insurer or ceding company decides to reinsure a portion of its risks, it will either deal directly with various reinsurers or deal with the reinsurers through a reinsurance intermediary or broker, who will negotiate the reinsurance contract with the reinsurer. The use of a reinsurance intermediary relieves the ceding company of the necessity of all direct dealing and negotiations on the acceptance and execution of the reinsurance contract. See Thompson, *Reinsurance* (4th Ed. 1966) pp. 222–223.

4. The sums of monies involved herein are as follows:

   1. Total premiums paid to P&B on all outstanding certificates of reinsurance    $451,793.00

   2. Total duplicate payments of premiums to replace the reinsurance cancelled by reinsurers for the contested reason of non-payment of premiums    28,779.00

   3. Total premiums known to be unremitted by P&B to various identified reinsurers    236,712.00

   4. Total premiums not known to be remitted or unremitted by P&B to other reinsurers    215,081.00

   5. A Loss claim under H. Primary Policy, issued to C. F. Industries and reinsured by Fortress Managers, etc.    15,188.86

5. A ceding company or a reinsured is the insurer which transfers to a reinsurer all or part of the insurance or reinsurance it has written. A reinsurer is the insurance company which assumes all or part of the insurance or reinsurance written by another insurer.

agent of Hartford for all purposes alleged including the receipt and transmission of all premium and loss monies relating to such facultative reinsurance placements.[6] Hartford appeals this decision.

■ At the outset it should be noted that the District Court is bound by the bankruptcy judge's findings of fact unless they are clearly erroneous. Rules 752(a) and 819 of the Rules of Bankruptcy Procedure; *In re Oxford Assoc.*, 209 F.Supp. 242 (D.N.J. 1962); *In re Botany Industries Inc.*, 463 F.Supp. 793 (E.D.Pa.1978).

The Bankruptcy Court made the following findings:

For some time prior to 1979, P & B had solicited Hartford to secure its reinsurance intermediary business. Eventually, Hartford did retain the services of P & B in placing its reinsurance.

Once Hartford made a determination that reinsurance was required on a particular risk that it had assumed, or was to assume, Hartford would either place the reinsurance directly, or avail itself of the services of an intermediary. Prior to October 1970 it had selected P & B to act as its intermediary on various facultative reinsurance contracts and continued to do so until 1974.

Upon determining that P & B was to act as intermediary on a specific transaction, Hartford would provide P & B with the important details of the risk, such as the name of the primary insured, the hazards involved, the background of the account, the reinsurance limits they would like to purchase, etc. As to the reinsurance premiums to be charged, they would either set a specific price, or ask P & B to secure the best quotation possible.

P & B would then collate this information and draw up a proposal which it would submit to Hartford for its approval. After securing Hartford's approval, P & B would submit the proposal to various reinsurers who were on Hartford's approved list.

P & B, being in competition with direct reinsurers and other intermediaries for the Hartford reinsurance business, would attempt to secure reinsurance at the best price and most favorable conditions for Hartford. P & B's relationship with Hartford is best evidenced by the testimony of a P & B officer, who testified that it was the policy of P & B to advise Hartford of the best price to be secured, even if it came from a direct reinsurer rather than through P & B, which would lose the business if Hartford decided to deal directly with the direct reinsurer.

After submitting the proposal to various reinsurers, P & B would secure quotations on the facultative reinsurance transactions from various reinsurers or reinsurance underwriters.

The proposals were then submitted to Hartford, which would approve them or instruct P & B to attempt to secure better terms. Once the proposals were approved by Hartford, P & B would then obtain an authorization from the reinsurer, which affirmed that the reinsurer would reinsure the risk. Thereafter, P & B would send confirmatory letters to Hartford and the reinsurers, specifying the details of the facultative reinsurance it had arranged on Hartford's behalf. Thereafter, the facultative reinsurance

**6.** "Facultative Reinsurance" is the reinsurance of an individual risk by offer and acceptance wherein the reinsurer retains the "faculty" to accept or reject each risk offered by the ceding company. *General Reinsurance Co. Glossary of Reinsurance Terms.*

The reinsurance contract issued in facultative reinsurance is called the reinsurance certificate and as is the case in all certificates under consideration herein, is usually an agreement between the primary insurer or ceding company and the reinsurer and does not affect the rights of the original insured.

"Treaty Reinsurance" is reinsurance in which the reinsurer is bound to accept the risks and the ceding company is bound to cede them. *General Reinsurance Co. Glossary of Reinsurance Terms.*

On March 1, 1979, the Bankruptcy Court ruled that P & B was the agent of Employers Surplus Lines Insurance Co. (ESLIC) in the all risk reinsurance treaty, not only for the purpose of ceding reinsurance but also for the receipt and transmission of all premium—loss—contingent commission monies due under the treaty.

certificate was drawn up and executed by the parties thereto.

P & B would then assemble and transmit to Hartford all of the facultative reinsurance certificates on the one transaction, and also forward to Hartford an invoice for each particular transaction or, on occasion, all P & B transactions in a given month.

If Hartford was satisfied with the information transmitted, it would then forward to P & B a check, payable to the order of P & B, covering one particular facultative reinsurance transaction, or many such transactions. This check was usually accompanied by a voucher identifying the amount of payment for each facultative transaction.

Upon receipt of the check, P & B would then deposit it in its general account. P & B would then proceed to apportion the proceeds of the check among the various facultative contracts, and also to the different participating reinsurers. On occasion, where necessary, P & B would also net out return premiums due from a reinsurer on a particular facultative agreement. P & B would then draw a check on its account, payable to each reinsurer, and forward same to the reinsurer. The check was accompanied by an invoice which set forth the amount of P & B's commission, which P & B had netted out from the gross amount due. This check would, if necessary, cover several facultative transactions involving the same reinsurer.

The payment by the reinsurers of loss claims was made in the following manner. When a loss claim was determined to be due by Hartford, it would direct P & B to advise each reinsurer of the amount of loss payment due from it. Upon receiving such information from P & B, the reinsurer would then draw a check payable to the order of Hartford and forward same to P & B for transmittal to Hartford.

During early 1975 Hartford became aware of P & B's financial problems and decided that premium monies would no longer be forwarded through P & B, but would be paid directly to the reinsurers.

On August 1, 1975 Hartford ceased doing business with P & B. For some time prior to that date, and thereafter, Hartford received complaints from its reinsurers that they were not receiving the premium payments due under the facultative reinsurance contracts.

This situation arose because P & B failed to transmit to the reinsurers the premiums forwarded to P & B by Hartford. Some of the reinsurers advised Hartford that they would cancel the reinsurance if they did not receive the overdue premiums, while other reinsurers advised Hartford that they were cancelling the reinsurance for nonpayment of premiums. In order to maintain the policies not cancelled and to secure reinsurance on the risks where the reinsurance was cancelled, Hartford was forced to disburse additional premium monies which it forwarded directly to the reinsurers.

■ Having reviewed the record below, it is conclusive that these findings are consistent with the evidence presented to the Bankruptcy Court and are therefore binding upon this Court.

Accepting these facts, the next consideration is whether an agency relationship was created between P&B and Hartford as the Bankruptcy Court concluded.

■ Agency, as a legal concept, is defined as:

> ... the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other to act.

*Restatement (Second) of Agency*, § 1 (1958). This relationship does not depend upon the intent of the parties to create it or the belief of the parties that it was created, but is dependent upon the manifest conduct of the parties. *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 523 F.2d 527 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).

■ Here, the conduct of Hartford and P&B as well as the reinsurers, clearly indi-

**270**

cates an agency relationship between Hartford and P&B.

P&B would secure reinsurers who would accept reinsurance on terms and conditions set by Hartford. All final decisions were made by Hartford. In securing reinsurance, P&B sought the best price available for Hartford.

Further, the agency relationship is seen by the actual authority Hartford delegated to P&B in collecting and transmitting monies on its behalf. Hartford, in making premium money payments to the reinsurers, would draw a check payable to the order of P&B. The check represented payments due on one or more facultative reinsurance risks. P&B would then, on behalf of Hartford, draw up statements to each individual reinsurer indicating the amount due them on each facultative risk and each facultative reinsurance certificate. The statement would also reflect the amount deducted as P&B's brokerage fee. P&B would then draw a check on its own account, payable to the order of the reinsurer and forward it on to them.

In contrast, the reinsurers would not make loss claims checks payable to P&B but would make them payable to the order of Hartford. This is a clear indication that in treating or dealing with P&B, the reinsurers did not delegate to P&B any authority whatsoever to act as its agent.

■ Hartford further contends that pursuant to N.J.S.A. 17:22–6.2a,[7] the reinsurers should be deemed to have authorized P&B to receive, on their behalves, payment of any premiums due on the reinsurance certificates.

The interpretive case law makes clear that N.J.S.A. 17:22–6.2a is a consumer protection statute, enacted for the purpose of protecting the general public in its insurance buying transactions and not to protect major insurance companies dealing with each other at arm's length. *See, e. g., Spilka v. South America Managers, Inc.*, 54 N.J. 452, 255 A.2d 755 (1969); *Weathers v. Hartford Insurance Group*, 153 N.J.Super. 563, 569, 380 A.2d 724 (App.Div.1977), *rev'd on other grounds*, 77 N.J. 228, 390 A.2d 548 (1978); *Kubeck v. Concord Ins. Co.*, 103 N.J.Super. 525, 533, 248 A.2d 131 (Ch.Div. 1968), *aff'd*, 107 N.J.Super. 510, 259 A.2d 473 (App.Div.1969).

N.J.S.A. 17:22–6.2a concerns itself with original insurance transactions entered into by the insurance purchasing public and the original insurer. On numerous occasions, attempts to apply a consumer protection statute to reinsurance have been rejected by New Jersey courts.

In *Aetna Casualty and Surety Company v. International Reinsurance Corporation*, 117 N.J.Eq. 190, 175 A. 114 (1934), the court distinguished between an insurance policy and a contract for reinsurance, and denied a reinsurer the right to participate in a statutory fund set up to protect and benefit holders of insurance policies. The Court again in *In re New Jersey Fidelity and Plate Glass Insurance Co.*, 15 N.J.Misc. 384, 191 A. 475 (Ch.1937), held that a reinsurer is not an insurance policy holder under a consumer protection statute, as it was not the intent of the legislature to benefit reinsurers. In the case of *Vera Democrazia Society v. Bankers National Life Insurance Co.*, 10 N.J.Misc. 632, 633, 160 A. 767 (1932), the court distinguished a contract for reinsurance from a contract of insurance and held that the same rules of construction that apply to an insurance policy do not apply to a reinsurance contract. It stated that:

7. N.J.S.A. 17:22 -6.2a states:

Any insurer which delivers in this State to any insurance broker a contract of insurance (other than a contract of life insurance, or life, accident or health insurance) pursuant to the application or request of such broker, acting for an insured other than himself, shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery or payment of any installment of such premium or any additional premium which becomes due or payable thereafter on such contract, provided such payment is received by such broker within 90 days after the due date of such premium or installment therefor or after the date of delivery of statement by the insurer of such additional premium.

Certainly there is no reason for applying the rules regarding forfeitures to a reinsurance contract, nor the rule that insurance policies should be construed most strictly against the insurance company.

10 N.J.Misc. at 633–644, 160 A. 767.

Furthermore, nowhere in the statute is the term "reinsurance". If the New Jersey legislature intended N.J.S.A. 17:22–6.2a to apply to reinsurance contracts it would explicitly so provide. *Moses v. Moses*, 140 N.J.Eq. 575, 53 A.2d 805 (1947) (an affirmative expression in a statute ordinarily implies a negation of any other); *In re Roy*, 28 N.J.L.J. 348 (1905) (in construction of statutes the expression of one thing operates as the exclusion of another that is unexpressed).

Lastly, California Union Insurance Co. (hereinafter California Union), one of the reinsurers, contends that P&B's role was one dual agency. It submits that P&B served as Hartford's agent only for the transmission of reinsurance premiums to the reinsurers; whereas, it served as agent to the reinsurers for transmission of loss money from the reinsurers to Hartford.

As stated previously, the process by which the reinsurers would pay Hartford for loss claims was as follows. When a loss claim was determined to be due Hartford it would direct P&B to advise each reinsurer of the amount of loss due it. Upon receiving such information from P&B, the reinsurer would then draw a check payable to the order of Hartford and forward same to P&B for transmittal to Hartford.

It is clear from this process, that the reinsurers exercised no control over P&B, nor did P&B consent to be subject to the control of the reinsurers. In the absence of the element of control, no agency relationship may be sustained. *Aetna Insurance Co. v. Glens Falls Insurance Co.*, 453 F.2d 687 (5th Cir. 1972).

Therefore, for the reasons stated, the Bankruptcy Court is affirmed.

Attorney for Trustee shall submit an appropriate order within seven (7) days.