675 A.2d 1198

LAURA CARMODY AND MICHAEL CARMODY, PLAINTIFF, v. DIRK DORITY; LIBERTY MUTUAL INSURANCE COMPANY, A CORPORATION OF THE STATE OF MASSACHUSETTS; JAMES BARILE, ET ALS., DEFENDANT.

Superior Court of New Jersey
Law Division Essex County

Decided December 21, 1995.

*Robert Winters* for plaintiffs.

*Anthony J. Andolino* for defendant (*Gallo Geffner Fenster,* attorneys).

YANOFF, J.S.C. (retired and temporarily assigned on recall).

Plaintiff Laura Carmody was a pedestrian who was struck on October 12, 1993, by an automobile while crossing the parking area of a service area of the Garden State Parkway where she had parked her car.

At that time she and her husband Michael were insured under a policy with defendant Liberty Mutual Insurance Co. (Liberty Mutual or Liberty), which provided them with $300,000 single limit liability coverage, but only the statutory minimum of uninsured motorists coverage (UIM) of $15,000 for each person and $30,000 for each accident.

The relationship between the Carmodys and Liberty began in 1981, when Laura Carmody telephoned an agent of Liberty Mutual by the name of James Barile and inquired with respect to securing an insurance policy. The uncontradicted evidence is that she requested a "$300,000 policy and whatever would go along with a $300,000 policy." At that time Barile did not discuss uninsured or underinsured motorist coverage with plaintiff.

Laura Carmody at trial testified that she did not know anything about such coverage and that it was not explained to her. The policy was renewed from year-to-year without change, except for substitution of a new automobile.

On one occasion she communicated with Barile's office to advise of a minor accident. The policy in controversy in this litigation became effective September 28, 1993, several weeks before the accident.

On another occasion Laura Carmody called Barile to ask whether she could secure an umbrella policy. At that time she was told that her policy limit of $300,000 was insufficient to warrant an umbrella policy. She was told nothing about her uninsured or underinsured motorist coverage.

It is uncontradicted that the Carmodys could have increased their UM/UIM coverage to $300,000 at a very small increase in premium.

When the New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act of 1984 became effective, Liberty annually mailed to the Carmodys a Buyer's Guide and Coverage Selection form. Since the Carmodys were already insured by Liberty at the time of the enactment of the statute, the insured was not required to complete a coverage selection form, except to change their automobile insurance coverage.

Liberty concedes that it did not send to the Carmodys what is generally known as the "fair notice" provision of *N.J.S.A.* 17:28–1.9b:

> [t]he coverage selection form required pursuant to section 17 of P.L.1983, c. 362 (C.39:6A–23) shall contain an acknowledgement by the named insured that the limits available to him for uninsured motorist coverage and underinsured motorist coverage have been explained to him and a statement that no person ... shall be liable in an action for damages on account of the election of a given level of motor vehicle insurance coverage....

Liberty explains this as an oversight.

Enclosed with the material sent to the Carmodys was the following:

### IMPORTANT NOTICE

New Jersey law requires that we send you the enclosed Coverage Selection Form with your renewal policy. You may use this Coverage Selection Form to select coverage options or limits that suit your insurance needs. We will endorse your policy to reflect any change in coverage options or limits that your select.

Please note that the Coverage Selection Form must be completed and signed by you should you, either now or in the future, wish to:

1) elect the "No Threshold" option;

2) change from the "No Threshold" option to the "Lawsuit Threshold" option;

3) elect the "PIP" Health Insurance Option";

4) purchase a Collision deductible or Comprehensive deductible in an amount other than $500; or

5) purchase a $500 Collision deductible or $500 Comprehensive deductible.

*Should you wish to retain the coverage options and limits that you presently carry on your policy, you need not return the Coverage Selection Form.*

Should you have any questions, please contact your Liberty Mutual Sales/Service Representative.

Notably, the "Important Notice" makes no reference to uninsured or underinsured motorist coverage. There was no reason why an insured should pay special attention to these items.

Laura Carmody has been offered $50,000, the policy limit of Dority, the driver of the motor vehicle which struck her, in settlement of her claim against him, for which she must give a general release.

Plaintiffs' attorney requested consent from Liberty to Laura Carmody's acceptance of the settlement offer, with a waiver of its subrogation rights by reason of *Longworth v. Van Houten*, 223 *N.J.Super.* 174, 538 *A.*2d 414 (App.Div.1988). Liberty refused. The result was this action by plaintiffs against Liberty to compel Liberty to waive its subrogation rights or, in the alternative, to reform the insurance policy to provide $300,000 in underinsured motorist coverage.

Plaintiffs made a motion to compel Liberty to waive its subrogation rights and consent to the settlement with Dority. Liberty countered with a cross-motion for summary judgment. Both motions were denied and the matter was set down for trial. The facts recited above are those which were produced at trial.

The central issue at trial was whether plaintiffs were entitled to reformation of the insurance policy to give them $300,000 underinsured motorist coverage. The defense interposed by Liberty was immunity under *N.J.S.A.* 17:28–1.9.

The statute consists of two sections, subsection a, enacted in 1983, and subsection b, which was added by the Laws of 1993, Chapter 156, section 1, effective June 29, 1993. It is this subsection which creates the immunity upon which Liberty relies. The policy in question was issued subsequent to the effective date of subsection b.

The majority opinion in *Strube v. Travelers Indemn. Co.*, 277 *N.J.Super.* 236, 649 *A.*2d 624 (App.Div.1994), *aff'd*, 142 *N.J.* 570, 667 *A.*2d 188 (1995), holds that subsection b is retroactive, so that the immunity created by it applies to policies issued prior to its

enactment. Judge Kestin dissented. *Strube* was affirmed December 6, 1995, by a divided Supreme Court. The majority affirmed on Judge Baime's opinion; two justices dissented substantially on Judge Kestin's opinion. I am therefore relegated in applying *Strube* to the Appellate Division opinions. The opening paragraph of Judge Baime's opinion reads:

> *N.J.S.A.* 17:28–1.9a provides that no person shall be liable in an action for damages due to a named insured's selection of a given level of motor vehicle insurance. The statute was intended to abrogate prior judicial decisions holding insurers, agents, and brokers liable for failing to advise their customers of the availability of additional underinsured and uninsured motorist coverage. At issue is whether the immunity granted by the statute applies to policies issued prior to its effective date, June 29, 1993. We hold that the immunity conferred by the statute extends to antecedent policies.
>
> [*Strube, supra,* 277 *N.J.Super.* at 237, 649 *A.*2d 624.]

At the end of his opinion, Judge Baime writes:

> *N.J.S.A.* 17:28–1.9a was intended to put an immediate end to this explosion of litigation by providing blanket immunity except in cases of willful, wanton, or gross negligence. *See Statement of the Senate Commerce Committee,* Senate No. 804 (1992). As originally introduced, the bill contained only the immunity provision presently set forth in *N.J.S.A.* 17:28–1.9a. The Senate Commerce Committee added subsection b, which requires the coverage selection form to include an acknowledgement by the named insured that all options have been explained to him and also a statement describing the immunity tracking the language set forth in subsection a. *N.J.S.A.* 17:28–1.9b. It is clear that subsection b is prospective only.
>
> [*Id.* at 242, 649 *A.*2d 624.]

In dissent, Judge Kestin states:

> This implicates another reason why we should favor an application of the rule of prospectivity rather than the exception, retrospectivity. To interpret subsection (a) as the majority does, renders the fair notice policy embodied in subsection (b) a nullity, at least with respect to all contracts of insurance entered into before the effective date of the statute.* We should normally avoid interpretations that nullify any provision of a statute.
>
> [*Id.* at 244, 649 *A.*2d 624.]

In the footnote in the quoted section, he writes:

> * Subsection (b) requires that an insured be notified, at the time coverage is contracted for, of the immunity conferred by subsection (a). The statute, however, does not expressly establish a sanction to be applied to the insurer that does not comply with the notification requirement. *Unavailability of the immunity might be one such sanction.*
>
> [*Id.* at 244–45, 649 *A.*2d 624 (emphasis added).]

There is no issue of retroactivity in the case at bar since the accident occurred after the effective date of subsection b. It is clear from *Strube* that subsection b applies in this case.

Both the majority and the minority opinions are consistent with the conclusion that, in order to obtain immunity, the carrier must comply with all the requirements of the statute. In the context of this case, the insured must be given the written "fair notice" specified in subsection b. This makes sense because it is that notice which advises that the insured is responsible for the selection of policy limits and that the insurance carrier has no such responsibility. Since this was not given to the plaintiff in this case, I am impelled to rule that the immunity does not apply.

In support of my ruling to require strict compliance with all the requirements of subsection b, in the face of the Supreme Court's expansive interpretation of *N.J.S.A.* 17:28–1.9a, I note that the statute, particularly as construed in *Strube*, is a departure from a long line of New Jersey decisions which hold that an insurance carrier is in a fiduciary position with respect to its insured and is obligated to deal with its insured fairly and in good faith. *See Bowler v. Fidelity and Cas. Co. of New York*, 53 *N.J.* 313, 250 *A.*2d 580 (1969); *Insinga v. Hegedus*, 231 *N.J.Super.* 562, 567, 555 *A.*2d 1183 (App.Div.1989); and *Harvester Chem. v. Aetna Cas. & Sur.*, 277 *N.J.Super.* 421, 429, 649 *A.*2d 1296 (App.Div.1994), *certif. denied*, 139 *N.J.* 441, 655 *A.*2d 443 (1995) (quoting *Bowler*).

In *Strube*, Judge Baime acknowledges: "[i]n a series of decisions, both the Supreme Court and the Appellate Division held that brokers and *agents* were required to inform insureds of available coverage and were obliged to exercise reasonable skill and good faith in advising their customers." *Strube, supra,* 277 *N.J.Super.* at 241, 649 *A.*2d 624 (emphasis added). The statute shifts to the consumer the responsibility of selecting insurance coverage despite the rulings in the above cases and the general rule set forth in *Rider v. Lynch*, 42 *N.J.* 465, 201 *A.*2d 561 (1964), that an insurance broker has a duty to provide the insurance

which he undertook to supply and if he fails to do so, he becomes liable to his principal for loss sustained.

What *Strube* considered, and what is involved in the case at bar, is uninsured or underinsured motorist coverage. It is understandable that the ordinary consumer may not be familiar with the necessity for such provisions in a state where insurance coverage for automobiles is required by law and where it is a violation of the motor vehicle law to operate without insurance coverage. *See* *N.J.S.A.* 39:6A–3; 39:6B–2.

The result reached here, which requires compliance by the carrier with all the provisions of subsection b in order to have immunity, is parallel with decisions, beginning with *Weathers v. Hartford Insurance Group*, 77 *N.J.* 228, 390 *A.2d* 548 (1978), under *N.J.S.A.* 17:29C–10, which deal with proof of mailing of notice of cancellation of an insurance policy. The issue in *Weathers* was whether the insurance carrier conformed to the statute in mailing a notice of cancellation. The insured denied receipt of the notice of cancellation. The carrier put in evidence its customary procedure in mailing notices of cancellation. The trial court held for plaintiff; the Appellate Division reversed; and the Supreme Court reversed the Appellate Division, holding that a fact question had been established. The effect of the Supreme Court opinion was to require precise performance of the requirements of the cited statute.

*Hodges v. Pennsylvania Nat. Ins.*, 260 *N.J.Super.* 217, 615 *A.2d* 1259 (App.Div.1992), is a case which illustrates the rule. The issue was whether, under *N.J.S.A.* 17:29C–10:

> at the time of the mailing of said notice, by regular mail, the insurer has obtained from the Post Office Department a date stamped proof of mailing showing the name and address of the insured and b. the insurer has retained a duplicate copy of the mailed notice which is certified to be a true copy.
>
> [*Hodges, supra*, 260 *N.J.Super.* at 222, 615 *A.2d* 1259.]

As to this, the court wrote, at page 223:

> [d]efendant's actions arguably satisfy the textual dictates of the statute because defendant did receive a dated post office stamp on its mailing list. But was this

stamp proof of *payment* of $138.75 in postage or was it proof of *mailing?* We see an ambiguity.

> [*Hodges, supra,* 260 *N.J.Super.* at 223, 615 *A.*2d 1259.]

In reversing, the court stated:

> A Certificate of Mailing entails individual review of letters and addresses by a postal employee; defendant's system entails only a self-serving cursory verification of a list of 640 names and addresses. Particularly disturbing about defendant's proof is the fact that defendant only paid $138.75, enough money for posting only 555 letters at $.25 per letter, yet the list claims 640 total mailings. Defendant does not account for this discrepancy of eighty-five notices printed on the master list but not accounted for in postage.

> [*Hodges, supra,* 260 *N.J.Super.* at 226, 615 *A.*2d 1259.]

*Ward v. Merced,* 277 *N.J.Super.* 590, 650 *A.*2d 10 (App.Div. 1994), *certif. denied,* 140 *N.J.* 275, 658 *A.*2d 299 (1995), may be read as ameliorating the strict requirements of *Hodges,* but nevertheless, for effective cancellation of a policy, it requires careful adherence to the requirements of the statute.

At oral argument, defendant relied strongly on *Andriani v. N.J. Mfs. Ins. Co.,* 245 *N.J.Super.* 252, 584 *A.*2d 875 (App.Div.1991). That case, however, was decided before the effective date of subsection b and is therefore not significant in interpretation of cases subsequent to its enactment. However, the case has some bearing with respect to the duty of the insurance carrier which operates through an agent, rather than through a broker, as to the insured. The issue there, as here, was whether the plaintiff could have acquired more extensive UMI coverage. The trial court found that the plaintiff, who made his contact with the carrier through its customer service representative, (CSR), did not establish a cause of action:

> Judge Dowden found that CSRs do not recommend coverage, give advice as to insurance needs, sell insurance, counsel the insureds or urge them to increase or decrease their coverage. Their sole purpose is to answer inquiries and incidentally update records.

> [*Andriani, supra,* 245 *N.J.Super.* at 255, 584 *A.*2d 875.]

The Appellate Division affirmed, reasoning:

> [h]ere, we are not concerned with the alleged negligence of an agent. Because there is no broker or agency relationship involved, the duty owed to plaintiff is that

owed by an insurer to its insured. In this respect, NJM fulfilled its statutory duty by mailing the coverage selection form and Buyer's Guide.

[*Andriani, supra*, 245 *N.J.Super.* at 256–57, 584 *A.*2d 875.]

In the case at bar Barile is designated an agent, not a customer's representative, because he had the right to issue policies. It may therefore be argued that his dereliction binds the carrier. However, I need not go that far since here, the insurance carrier did not comply with the requirements of subsection b by mailing the "fair notice." This alone is enough to defeat its claim for immunity.

Thus, plaintiffs are entitled to reformation to provide Uninsured Motorist Coverage in the amount of $300,000. *See Weinisch v. Sawyer*, 123 *N.J.* 333, 587 *A.*2d 615 (1991). Plaintiffs attorney will submit an order pursuant to the Rules.