208 N.J. Super. 182 (1986)
505 A.2d 177
IN THE MATTER OF N.J.A.C. 11:1-20.
Superior Court of New Jersey, Appellate Division.
Argued January 6, 1986.
Decided February 3, 1986.
*186 Before Judges MORTON I. GREENBERG, LONG and HAVEY.
George K. Bernstein of the New York and District of Columbia bars, admitted pro hac vice, argued the cause for appellants (McCarter & English, attorneys; George K. Bernstein and Eugene M. Haring, of counsel; Ronald J. Hedges and J. Forrest Jones, on the briefs).
John J. Hayden, Deputy Attorney General, argued the cause for appellant (Irwin I. Kimmelman, Attorney General, attorney; Deborah T. Poritz, Deputy Attorney General, of counsel; John J. Hayden and Patrick J. Hughes, on the briefs).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
These matters come on before this court on consolidated appeals from the adoption of an administrative rule, N.J.A.C. 11:1-20, by the commissioner of insurance ("commissioner") on an emergency and then normal rule-making basis under the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. The rule was designed to curb what the commissioner conceived as abuses by insurance companies, including midterm policy cancellations, blanket nonrenewals, cancellations of entire lines of insurance and midterm premium increases without adequate reasons or notice to the insureds. There were two separate appeals filed as appellants, the American Insurance Association, *187 National Association of Independent Insurers and Alliance of American Insurers, appealed from both the emergency and normal adoption of the rule. Appellants seek a judgment invalidating the rule. In general they contend that the rule is arbitrary, capricious and unreasonable, impairs vested contract rights, was adopted without statutory authority, is inconsistent with New Jersey insurance laws, is ultra vires, was adopted in violation of the Administrative Procedure Act, is unconstitutionally vague and unconstitutionally takes property without due process of law.
The case was triggered on September 16, 1985 when the commissioner with the approval of the governor pursuant to a certificate of emergency adopted N.J.A.C. 11:1-20 to be effective September 17, 1985. At that time the Governor certified there was an emergency necessitating adoption of the rule on an emergency basis. See N.J.S.A. 52:14B-4(c). His certification was accompanied by a statement of imminent peril issued by the commissioner. On October 25, 1985 appellants appealed from the commissioner's action in adopting the rule. They immediately moved for a stay of the implementation of the rule but their application was denied by this court and the Supreme Court.
The rule as adopted on September 16, 1985 would, unless readopted, have expired on November 16, 1985. See Ibid. However on November 16, 1985 it was readopted pursuant to normal Administrative Procedure Act requirements. See N.J.S.A. 52:14B-4(a). At that time the section defining the rule's scope was amended on an emergency basis to exclude certain special types of policies as well as policies written by surplus-lines insurers. Immediately after the readoption of the rule appellants again appealed and again unsuccessfully sought a stay of the effectiveness of the rule. Accordingly the rule has been in effect and thus the parties have had experience in implementing it.
*188 We set forth the facts from the extensive record in the case. In his certificate the Governor expressed concern regarding the number of consumers' and agents' complaints of insurers' mid-term cancellations of property or casualty insurance policies, blanket nonrenewals, cancellation of entire lines of insurance and midterm premium increases. He pointed out that these practices had an adverse impact on the insurance-buying public and "assail the very fabric of this State's economic system." Because of the confusion in the marketplace and the undue economic hardship brought about by these problems the Governor determined that immediate action was necessary to ensure that New Jersey insurance consumers received fair and equitable treatment consistent with law.
In the commissioner's statement of imminent peril she noted the increasing influx of consumers' and agents' complaints received by her department regarding "indiscriminate cancellation, nonrenewal, premium increase and underwriting practices of commercial insurers." She indicated that carriers had suffered increasing underwriting losses and had previously under-priced insurance. She further stated that reinsurers were withdrawing from the United States market and insurers were finding themselves in a "capacity crunch," leaving major manufacturing and service industries unable to purchase insurance protection at any price from any company. The commissioner pointed out that "[m]unicipalities, environmental concerns, product manufacturers, medical professionals, transit authorities, nurse-midwives and day-care centers" were among the hardest hit enterprises as they were faced with exorbitant rates, refusals by insurers to renew coverage and termination of coverage. She noted that some insurance consumers including day-care centers, municipalities, transit authorities and truck and bus operators had suffered 2,000% rate increases in the past year.
Though acknowledging that the property and casualty insurance industry had suffered losses over the past seven years so that more disciplined underwriting and better rate structures *189 were required, the commissioner saw no justification for the practices adopted by insurers in terminating coverage prior to the expiration dates of policies and increasing rates and reducing coverage in midterm. She further noted that the industry had made financial gains as a result of good investments and she pointed out that insurers had a low tax burden and had ample resources available to meet all contingencies.
The commissioner considered these conditions as requiring her to adopt emergency procedures to restrict midterm cancellations and midterm price increases, to prohibit block cancellations and nonrenewals and to require timely notice of nonrenewal and cancellation in property and casualty commercial lines. Noting that "[s]ociety cannot function properly when its commerce is so disrupted," the commissioner asserted that her statutory responsibilities required her to "take aggressive action to protect the interests of policy holders and the State, to the extent that insurance companies provide reasonable, equitable and fair treatment to the insuring public." In the notice publishing the text of the rule the commissioner indicated that although N.J.A.C. 11:1-20 was adopted on an emergency basis, the rule was being proposed for readoption in compliance with the normal rule making requirements of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq.
N.J.A.C. 11:1-20 is divided into seven sections. In general it requires approval by the commissioner of the reasons for an insurer to cancel a policy during its term or to fail to renew it. In addition, it forbids midterm premium increases and block cancellations and restricts nonrenewal of entire lines of insurance.
N.J.A.C. 11:1-20.1 establishes the scope of the regulation and indicates it applies to all property and casualty/liability insurance policies except workers' compensation insurance and accident and health insurance. However, when the rule was readopted, this section was amended on an emergency basis to *190 exclude policies written by surplus-lines insurers and certain special risks.
N.J.A.C. 11:1-20.2 sets out a procedure for an insurer to obtain the commissioner's approval for the reason or standard for nonrenewals and cancellations of policies. It requires that the reason or standard for the proposed termination be submitted to the commissioner for approval at least 90 days prior to the expiration date of a policy. The commissioner reviews the submission to determine compliance with applicable statutes or regulations and must approve or disapprove the reason or standard in writing within 30 days and advise the insurer of her decision. Of course this provision does not require that each termination of a policy be approved. Thus if the underwriting standard has previously been approved it may be used without further approval as a basis for termination of coverage.
N.J.A.C. 11:1-20.3 establishes the requisites for cancellation or policy nonrenewal, adopts a schedule for notice of cancellation and nonrenewal and provides that each notice must indicate the reason for the termination. Unless the cancellation is based upon either the existence of a moral hazard or the nonpayment of premium, the notice must also indicate that the commissioner has approved the basis for termination. Subsection (a) provides that "[e]ach renewal shall offer coverage at least as favorable to the insured as the expiring policy and at the same limits and terms, subject to changes approved by the Commissioner that had become effective since the commencement of the current policy period." Subsection (e) requires that the notice inform the insured of the right to contest the cancellation or nonrenewal by filing a written complaint with the department. Subsection (c) defines moral hazard as either the risk, danger or probability that the insured will destroy the insured property or permit it to be destroyed for the purpose of collecting the insurance proceeds, or the substantial risk, danger or probability that the personal habits of the insured may increase the possibility of loss or liability for which an insurer will be held responsible. It also provides that any change in the circumstances *191 of an insured that will increase the probability of either destruction, loss or liability can also be considered a moral hazard.
N.J.A.C. 11:1-20.4 requires that all insurance policies contain provisions clearly and specifically stating the grounds upon which the insurer will cancel or fail to renew coverage. Further, it describes the conditions or circumstances which will allow an insurer to initiate cancellation or nonrenewal procedures and includes four acceptable grounds: (1) nonpayment of premiums; (2) material misrepresentation; (3) substantial and unforseeable change in the risk assumed; (4) substantial breaches of contractual duties, conditions or warranties.
N.J.A.C. 11:1-20.5 specifically prohibits certain practices. These include midterm premium increases, reductions in the amount or type of coverage, block cancellation or nonrenewal of entire lines of insurance, withdrawing from classes of business without approval of the commissioner and terminating an agent to achieve block cancellation or nonrenewal of entire lines of insurance.
The final two sections are N.J.A.C. 11:1-20.6, a severability provision, and N.J.A.C. 11:1-20.7, which establishes penalties and remedies for an insurer failing to adhere to the rule. The remedies include immediate reinstatement of any policy without lapse in coverage terminated in violation of the rule.
Following the adoption of N.J.A.C. 11:1-20 on an emergency basis, the commissioner and members of her staff met with representatives of the insurance industry to explain the rule, review suggestions and discuss amendments. The industry then formed a smaller "working group" which worked with the department to clarify application of the rule and structure possible amendments. Inasmuch as the rule raised certain interpretative questions, the commissioner sought to clarify it by written bulletins. On October 9, 1985 she issued Bulletin # 85-1 and on October 17, 1985 she issued Bulletin # 85-2, both interpreting and clarifying the rule. The second bulletin disapproved *192 use of a general statement of "failure to meet applicable underwriting guidelines" as a reason for canceling or nonrenewing policies. It did, however, approve certain other standards or reasons for termination of coverage including nonpayment of premiums, material misrepresentation or nondisclosure of facts, unforseeable increased hazards, substantial breaches of duties, conditions or warranties affecting the risk, lack of cooperation of the insured for loss control and fraud by the insured.
The record contains the commissioner's affidavit dated October 30, 1985 reviewing the problems in the industry and the crisis that existed. Her affidavit includes numerous exhibits showing coverage had been terminated for such general grounds as "underwriting reasons," "underwriting," or "for underwriting reasons." Insurers were using these reasons for terminating coverage notwithstanding N.J.S.A. 17:22-6.14a2 which requires that all notices of nonrenewal for failure to meet current underwriting standards must specify in detail the factual basis upon which the underwriting standard had not been met.
In her affidavit she explained how the rule would be administratively implemented. She said she had reassigned staff investigators to the underwriting complaint section of her department, hired temporary employees and directed inquiries from the public to a communications unit established within the prior year. She further indicated she would reassign other employees for the work the rule generated. She pointed out that as of October 28, 1985, all 433 requests from insurers for approval of reasons for termination of coverage had been answered by the department within 30 days.
The record includes affidavits from insurers setting forth problems the rule might cause for the industry. The insurers were concerned they would not be allowed to cancel or nonrenew policies in cases in which they were unable to obtain reinsurance. They also complained about the vagueness of the *193 standards for cancellation and nonrenewal. Further, they anticipated the rule would engender litigation among the insurers, insureds and the department. In addition, they stated compliance with the rule would be costly and impractical and its retroactive application would be unfair.
The record shows, however, that certain insurers seem not to object strenuously to the rule. The Farmers Mutual Fire Assurance Association of New Jersey asserted that it found "no real difficulty in living within the framework for cancellation requirements on either personal lines or commercial lines." Further, in a letter to its agents it indicated that in the future it would more thoroughly investigate the underwriting of all new commercial business policies and was requiring that all applications for insurance were to be received at its home office 60 days prior to the date of the policy. State Farm Insurance Companies indicated that they did not engage in any of the activities the rule was designed to prohibit and, though objecting to certain language in the rule, said they would comply with it.
As we have indicated, on November 16, 1985 the rule was readopted on a permanent basis unchanged except for an amendment on an emergency basis to exclude surplus-lines insurers. At that time significant amendments to N.J.A.C. 11:1-20 and a new regulation, N.J.A.C. 11:1-22, were proposed. We believe that these changes, which will remove personal lines coverage from the rule, among other things, will meet many of appellants' objections. Nevertheless appellants contend that they have a right to have the validity of the original rule as adopted on both an emergency and permanent basis determined. Apparently appellants believe that retroactive invalidation of the rule will allow insurers to avoid liabilities derived from policies in effect as a result of the original rule. In recognition of this position we will decide the case without considering changes in the rule after November 16, 1985. We will not, however, rule on the original application of the rule to surplus-lines insurers as the commissioner seems to acknowledge *194 that such insurers cannot be covered by the rule and has excluded them by the emergency amendment to N.J.A.C. 11:1-20. See Railroad Roofing, etc., Co. v. Financial Fire & Cas. Co., 85 N.J. 384 (1981).
In considering appellants' contentions we deal first with their procedural argument that the rule was initially adopted on an emergency basis in violation of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. Appellants assert that the commissioner's statement of imminent peril contained only vague, "conclusory" and unsubstantiated allegations and the department's certificate of emergency did not contain an attesting certificate or a written statement specifying the measures being taken to inform the affected parties of the adoption of the rule.
The Administrative Procedure Act in N.J.S.A. 52:14B-4(c) provides:
If an agency finds that an imminent peril to the public health, safety, or welfare requires adoption of a rule upon fewer than 30 days' notice and states in writing its reasons for that finding, and the Governor concurs in writing that an imminent peril exists, it may proceed without prior notice or hearing or upon any abbreviated notice and hearing that it finds practicable, to adopt the rule. The rule shall be effective for a period of not more than 60 days unless each House of the Legislature passes a resolution concurring in its extension for a period of not more than 60 additional days. The rule shall not be effective for more than 120 days unless repromulgated in accordance with normal rule-making procedures.
N.J.S.A. 52:14B-4(c) is supplemented by N.J.A.C. 1:30-4.4(a) which establishes the content of the documents required to be filed by an agency when adopting an emergency rule pursuant to N.J.S.A. 52:14B-4(c):
(a) Any agency adopting an emergency rule pursuant to N.J.S.A. 52:14B-4(c) shall prepare and present to the Office of Administrative Law at the time of submitting the rule for filing, a certificate of emergency which shall include the following:
1. The agency head's order adopting or changing the rule;
2. A written statement specifically describing the reasons for the agency head's finding that there is an imminent peril and that the peril necessitates emergency proceedings. The specific reasons shall contain facts upon which a reasonable person could conclude the existence and nature of the harm to the public which necessitates immediate rulemaking action or which would *195 result if normal rulemaking requirements were complied with, and shall not be merely conclusionary statements or repetition of statutory language. Specific reasons may include the immediate need to conform rules to the requirements of Federal or State statutes, Federal regulations, or court orders;
3. A written summary of the subject matter of the rule and the way it will respond to the imminent peril;
4. A certificate of the adopting officer attesting to the facts set forth in the statement;
5. The expiration date of the rule pursuant to N.J.S.A. 52:14B-4(c);
6. A certificate of the Governor attesting to the existence of an imminent peril which justifies the emergency rulemaking proceeding;
7. A written statement specifying the measures being taken to inform affected parties of the rule.
In our view, in light of the commissioner's statement of imminent peril, it is clear she set forth a factual basis for adoption of the rule on an emergency basis. She recited the department's knowledge of a great influx of consumer and agent complaints concerning indiscriminate cancellation, nonrenewal, premium increases and underwriting practices of commercial insurers such as "mid-term cancellations, mid-term increases in premiums, failure to provide timely notice of nonrenewals and block cancellations and nonrenewals of entire lines of insurance." While appellants contend these statements are vague and conclusory it is obvious they are a description of specific conduct of which the department had evidence on the basis of consumers' and agents' complaints. In addition, the commissioner set out facts concerning the financial stability of the industry and this tended to negate any hardship from the rule. Further, she expressly stated that the rule was required to stem the unfair and harsh practices of the insurance industry in this state.
It does appear, however, that there were two technical errors in the adoption of the rule on an emergency basis. In the certificate of emergency there is no indication of the manner in which the insurers were to be notified of the adoption of the rule and there is no certificate of the commissioner attesting to facts set forth in her statement, both requirements of *196 N.J.A.C. 1:30-4.4(a). However, N.J.S.A. 52:14B-4(d) provides that the validity of a rule depends upon substantial compliance with the act. In our view there was substantial compliance. Certainly in light of the broad publicity regarding the adoption of the rule the industry knew of it. Further, the record shows that within three days of the adoption of the rule notice of it was sent by mailgram to all property and casualty companies authorized to do business in New Jersey and a copy of the rules was mailed to them. We regard the failure of the commissioner to attest to the facts as a technical oversight. Thus while we do not condone any failure to comply with the procedural requirements for adoption of an emergency rule, we will not invalidate the rule on the basis of these minor errors as there was substantial compliance with the Administrative Procedure Act. Finally, on this procedural issue we point out that adoption of the rule on a normal basis cured these minor procedural defects in the emergency adoption and thus justifies upholding the rule ab initio. See Assoc. of N.J. State Col. Fac. v. Dungan, 64 N.J. 338, 349 (1974).
With respect to substantive issues, initially we consider and reject appellants' principal contention on this appeal that there is no statutory authority for the rule. N.J.S.A. 17:22-6.14a1 requires that all property and casualty insurers doing business in New Jersey file a copy of their current underwriting guidelines with any applicable amendments or modifications with the department at the request of the commissioner. It further provides that the underwriting guidelines as amended and modified shall not be arbitrary, capricious or unfairly discriminatory. N.J.S.A. 17:22-6.14a2 states that when a policy is not renewed because the risk does not meet the current underwriting standards, the notice of nonrenewal shall identify the underwriting standard and specify in detail the factual basis for determining the standard has not been met. Further, the commissioner is authorized to adopt, promulgate and enforce *197 rules and regulations necessary to implement the above sections. See N.J.S.A. 17:22-6.14a3. In addition N.J.S.A. 17:29C-1 gives the commissioner authority to direct insurers by rule or regulation to include provisions in policies for notice to an insured of the cancellation of the policy or of the insurer's intention not to renew the policy. It seems clear to us that the rule is in furtherance of these policies. The rule permits the commissioner to review underwriting standards and prohibits discriminatory and unfair practices and deals with the precise matters set forth in these statutes.
Contrary to appellants' contentions we do not find that the rule violates the Commercial Insurance Deregulation Act of 1982, N.J.S.A. 17:29AA-1 et seq. That act prohibits use of policy forms that are unfair, inequitable, misleading or contrary to law. N.J.S.A. 17:29AA-11. N.J.A.C. 11:1-20 clearly furthers the goal of producing forms that are not unfair, inequitable, misleading or contrary to law. Further, the rule does not preclude premium changes on renewals. In any event we discern no legislative intent that the purposes of the act to encourage competition and efficient economic rating and marketing practices (N.J.S.A. 17:29AA-2) would somehow usurp the commissioner's powers to act in the crisis situation facing her.
We find no merit in appellants' contention that the rule is arbitrary, capricious and unreasonable. The Supreme Court in New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544 (1978), held that administrative rules must be accorded a presumption of reasonableness and the challenging party has the burden to demonstrate they are arbitrary, capricious, unduly onerous or otherwise unreasonable. Id. at 561. Appellants contend the rule is arbitrary and capricious as it creates adjudicatory proceedings which the commissioner "concedes" cannot be conducted because of a staff deficiency. But we find *198 the commissioner's alleged concession is nothing of the kind. Rather it is simply an economic impact statement appended to the certificate of emergency submitted with N.J.A.C. 11:1-20 acknowledging that the department will incur additional costs as a result of the need to implement procedures for review and approval of the cancellation and nonrenewal standards, as well as to handle the larger number of consumer complaints generated by the rule. The statement acknowledged the need for additional staff to review underwriting guidelines and process policy holder complaints, but it indicated the costs could be absorbed within the current budget. Furthermore, the record shows that of 433 requests from insurers for approval of underwriting guidelines received before the commissioner's affidavit of October 30, 1985, each was reviewed and answered within 30 days of the department's receipt of the request. Finally, on this issue we point out that at oral argument we were told that as guidelines are established there will be a diminished need for their review and that, as of the argument, the department was still complying with the 30 day time constraint to review reasons for proposed terminations.
Appellants contend that the rule is invalid as it may cause insurers to become insolvent because they will not be able to cancel unreinsurable policies and because the rule encourages cancellation rather than renegotiation of coverage, thus effectively reducing the capital available to write new policies of insurance. We see no merit to these contentions. The rule does not compel an insurer to maintain a bad risk or a risk which cannot be reinsured. All it does is require that insurers adhere to the statutory requirement of providing specific reasons why a risk is being terminated. Further, Bulletin # 85-1 expressly permits the insurer to adjust its rates on renewals according to the risk and indicates insurers are not precluded from changes in coverage, including reductions in coverage and policy limits, mutually agreed upon between the *199 insurer and a policy holder. N.J.A.C. 11:1-20.2 allows cancellations and nonrenewals as long as the reasons or standards upon which the termination is based have been approved by the commissioner.
Appellants also contend the rule is invalid because it operates retroactively. But as clarified by Bulletin # 85-1 the rule applies only to policies in force on September 17, 1985, the date it became effective. While it is true that it does apply to termination notices issued before September 17, 1985 with respect to coverage ending after that date, this limited retroactivity will not invalidate the rule in this highly regulated field. See Windman v. City of Englewood, 200 N.J. Super. 218 (App.Div. 1985).
We see no merit to appellants' contention that the rule is unconstitutionally vague as it allows the commissioner to evaluate every cancellation or nonrenewal of a liability, property or casualty insurance policy, but fails to specify the standards by which the commissioner must act. Though the rule does not set out the standard by which the commissioner must evaluate an insurer's reasons for cancellation or nonrenewal, it implements the statutory scheme we have already set forth and these statutes contain the standards.
Appellants assert that the rule unconstitutionally takes private property for public use because it compels an insurer to dedicate a portion of its assets to insuring risks which it does not wish to insure and the rule may be construed to preclude insurers from obtaining premium increases in the ordinary course of business. We see no merit to these contentions. On this issue we initially point out that in the insurance field assigned or mandatory coverage is not unusual. In any event, as set forth in Bulletin # 85-2, an increased hazard or material change in the risk assumed, not reasonably contemplated by the *200 parties at the time the policy was issued, is an approved reason for cancellation or nonrenewal. Further, as set forth in Bulletin # 85-2, a loss or substantial change in available reinsurance or available insurance capacity, as well as a material increase in a company's exposure arising from changes in statutory or case law, can constitute an approved cause for cancellation or nonrenewal under N.J.A.C. 11:1-20.5.
Furthermore, the rule does not prohibit a premium increase where necessary to reflect coverage of an increased risk. The rule, at least with respect to commercial lines of insurance, does not limit an insurer's ability to tailor its rates accordingly without prior approval of the commissioner. See N.J.S.A. 17:29AA-8; 17:29AA-9; 17:29AA-10. Thus, the rule does not unconstitutionally take private property.
Finally, we see no merit to appellants' contention that the rule unconstitutionally impairs contractual obligations. The record shows the rule promulgated in a highly regulated industry, was: (1) determined by the commissioner and the Governor to be needed in response to an emergency situation for the protection of insureds in this State; (2) was enacted to protect a basic societal interest in maintaining insurance coverage without arbitrary deprivation thereof; (3) was precisely tailored to meet the existing emergency; (4) imposed reasonable conditions upon the insurers which were basically those imposed by statute but in some cases were being ignored by insurers; and (5) was initially limited in duration to the time when the rule could be adopted by normal administrative procedure. See Energy Reserves v. Kansas Power & Light, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).
In summary we conclude that N.J.A.C. 11:1-20 is valid and we uphold the rule as adopted on both an emergency and an ordinary basis.