277 N.J. Super. 421 (1994)
649 A.2d 1296
HARVESTER CHEMICAL CORPORATION, PLAINTIFF-APPELLANT,
v.
AETNA CASUALTY & SURETY CO., AND MANUEL AND LIZBETH BORELLY, DEFENDANTS-RESPONDENTS, AND J.B. SLATTERY & BROS., INC., PUBLIC SERVICE ELECTRIC & GAS, IRVINGTON ASSOCIATES AND THE NIA GROUP, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1994.
Decided November 18, 1994.
*422 Before Judges PETRELLA, BROCHIN and CUFF.
Kevin F. Colquhoun argued the cause for appellant (Colquhoun & Colquhoun, attorneys; Mr. Kevin Colquhoun, on the brief).
W. Stephen Leary argued the cause for respondent Aetna Casualty & Surety Co. (Leary, Bride, Tinker & Moran, attorneys; Mr. Leary, on the brief).
*423 Eugene T. Paolino argued the cause for respondents Manuel and Lizbeth Borelly (Panepinto, Paolino, Doherty & Mangin, attorneys; Mr. Paolino, on the brief).
No other parties participated in this appeal.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
This appeal arises from the grant of a cross-motion for summary judgment against Harvester Chemical Corporation (Harvester) dismissing its declaratory judgment complaint against Aetna Casualty & Surety Company (Aetna). Harvester asserts that Aetna wrongfully terminated Harvester's annual insurance contract. For various reasons Harvester contends that the insurance contract should be considered to have been in effect on the date when an incident occurred giving rise to a products-liability-type personal injury claim.[1]
Harvester argues that the cross-motion for summary judgment should not have been granted against it because: (1) Aetna did not properly notify it of the May 23 cancellation and, hence, that cancellation notice was ineffective; (2) the dates of cancellation were ambiguous; (3) the cancellation was contrary to public policy; and (4) Aetna is bound by promissory estoppel.
The arguments on the public policy issue and the timeliness of the cancellation notice have merit. The other issues raised are essentially without merit, R. 2:11-3(e)(1)(E), and we need not discuss them. Although fact issues exist on the question of the effectiveness of the first cancellation notice,[2] our opinion does not turn on that point in the first instance because the insurance *424 contract between Aetna and Harvester would violate public policy if it could be cancelled, as Aetna argues, merely by giving thirty days' notice "for any reason," which means even if the reason is only subjective to Aetna or no reason, or no good cause. The subject termination provision should properly be construed as requiring that Aetna must demonstrate a sufficient objective reason for cancellation mid-term, as opposed to non-renewal at the end of the policy term.[3]
On November 11, 1984, Harvester, through National Insurance Associates (NIA), its insurance agent, renewed its general liability insurance policy with Aetna. Harvester borrowed $9,600 from AFCO, a premium finance company, towards payment of the annual premium of approximately $12,500.[4] Under its agreement with NIA, AFCO sent $9,600 to NIA on December 10. Harvester paid the balance to NIA on December 26, 1984.
An amendment to the policy provided that:
With respect to the cancellation for any reason other than nonpayment of premium, this policy may be canceled by mailing to the named insured, at the address shown in this policy, written notice stating when not less than thirty days thereafter, such cancellation shall be effective. (Emphasis added).
On May 23, 1985, Aetna purported to cancel the policy for "underwriting considerations."

I.
Aetna asserts that the policy permits cancellation for any reason by mailing notice to the insured at least thirty days before the effective date of cancellation, and moreover, that an unspecified "underwriting reason" constitutes "any" reason.
According to certifications Aetna submitted with its cross-motion, Aetna claims it mailed a cancellation notice on April 23 to be *425 effective May 23, 1985. Harvester disputes this, stating it has no record of receipt of such a notice. Aetna presented no documented records of mailing the specific notice. Aetna offered proof with its cross-motion by way of certification that employees adhered to company mailing procedures and company pre-cancellation telephone notification procedures. Additionally, Aetna relied on deposition testimony alleging that Harvester had admitted receipt of the notice in a telephone conversation with an NIA agent in mid-April.
On May 24, Harvester ceased premium payments, and sought new insurance coverage through NIA. However, Harvester could not obtain coverage because of prevailing insurance market conditions and the dangerous nature of its product line. During the time it sought to obtain replacement coverage, Harvester's principals acknowledged in correspondence that Aetna had cancelled Harvester's insurance effective May 23, 1985.
Subsequent to cancelling the policy, Aetna undertook an accounting and reconciliation between AFCO, Harvester, and NIA to determine the "unearned" portion of the premium. Aetna notified Harvester of an unearned premium on November 7, 1985, when Aetna indicated it owed AFCO $4,883 in unearned premiums (Aetna issued a credit in that amount to NIA); Harvester owed AFCO $3,396 on its loan (NIA debited Harvester's account and transferred that sum to AFCO); and NIA owed a balance of $1,486.58 in unearned premium to Harvester.[5]
Aetna mailed Harvester a second notice of cancellation on November 8, 1985, indicating that coverage would be cancelled effective November 12, 1985, for nonpayment of premium. Typed on the form notice was the statement: "This notice is to confirm an AFCO cancellation notice dated 5-23-85." Aetna claims that this second notice was sent in error. Indeed, one of Harvester's *426 principals conceded in her deposition that Aetna probably sent the notice in error.
Between May 23 and December 13, 1985, two events of significance to the dispute between the parties occurred. First, on September 17, the Commissioner of Insurance (Commissioner) promulgated emergency regulations that substantially revised commercial insurance cancellation procedures. The reforms were aimed at preventing insurers from arbitrarily cancelling coverage in the manner that Aetna had cancelled Harvester's coverage. Second, on October 5, 1985, Manuel Borelly was seriously burned by a product that Harvester had manufactured. Borelly filed a complaint against Harvester on March 4, 1987, grounded in strict liability, negligence, and breach of express and implied warranties. Aetna denied coverage based on its claims that it cancelled Harvester's policy effective May 23, 1985.
Harvester instituted a declaratory judgment action against Aetna demanding that it defend the Borelly lawsuit and provide indemnification. After Harvester amended its complaint to include NIA the matter was consolidated with Borelly's underlying tort action.
In granting Aetna's cross-motion and dismissing Harvester's declaratory complaint, the motion judge stated that prior to the Commissioner's adoption of the emergency regulations, insurance carriers could cancel or refuse to renew general liability policies midterm if the insured was given proper notice. However, the judge concluded that Harvester was not entitled to relief under the emergency regulation because the underlying policy was obtained in November 1984, about eleven months before the emergency regulations were adopted, and the policy was cancelled some four months before the effective date of those regulations. The judge also concluded that Harvester's promissory estoppel claim, based upon Aetna's delay in returning the premium and the second cancellation notice, was groundless because the oral and written transactions between Aetna, Harvester, NIA, and AFCO *427 indicated that Harvester could not have reasonably relied upon the November 8, 1985 cancellation notice as an admission of coverage.
Subsequently, Harvester entered into a consent judgment resolving Borelly's case.

II.
We turn first to Harvester's public policy argument and the related issue of how the cancellation endorsement of Harvester's policy is to be construed. In general, public policy is determined by the "federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, [and] the acknowledged prevailing concepts of the federal and state governments relating to and affecting the safety, health, morals and general welfare of the people." Allen v. Commercial Cas. Ins. Co., 131 N.J.L. 475, 478, 37 A.2d 37 (E & A 1944). Prior to September 1985, few executive, legislative, or judicial pronouncements discussed mid-term insurance cancellation on grounds other than non-payment of premium or fraud.
The Legislature had enacted the "Commercial Insurance Deregulation Act of 1982" (the Act), effective November 18, 1982. N.J.S.A. 17:29AA-1 to -32. The Act states that its purposes are to encourage price competition in writing commercial lines of insurance, prevent monopolistic practices, encourage efficient and economic rating and marketing practices, and prevent the lessening of marketplace competition. N.J.S.A. 17:29AA-2. Although the Act was obviously designed to implement these purposes, the Act also contained a prohibition on unfair practices. N.J.S.A. 17:29AA-11 provides that "[p]olicy terms shall not be unfair, inequitable, misleading or contrary to law, nor shall they produce rates that are excessive, inadequate, or unfairly discriminatory."
This statute helps insure that a purchaser of an insurance policy, which is really an adhesion contract, see Rudbart v. North Jersey Dist. Water Supply Comm'n, 238 N.J. Super. 41, 568 A.2d 1213 (App.Div. 1990), rev'd and rem'd, 127 N.J. 344, 368-369, 605 *428 A.2d 681 (1992) (concurring opinion), has some protection since in the usual case there is no opportunity to bargain regarding the terms of an insurance policy. Sparks v. St. Paul Ins. Co., 100 N.J. 325, 338, 495 A.2d 406 (1985). A totally one-sided arrangement renders illusory what is supposed to be a "contract" between the parties.
With respect to the cancellation and non-renewal of fire and casualty coverage, then applicable N.J.A.C. 11:1-5.5 provided:
(a) all fire and casualty policies of insurance, except accident and health policies, shall provide for the issuing company to give: 1. thirty days' written notice to the assured of the cancellation of any policy; 2. thirty days' written notice of cancellation of any policy to any mortgagee mentioned in said policy; and 3. thirty days' written notice to the assured of same company's intent not to renew any policy.
The Executive Branch of State Government, through the Commissioner of Insurance, had not taken steps to define proper grounds for policy cancellation until September 17, 1985, after Aetna's May 23, 1985 purported cancellation of Harvester's policy. Among other things, the new regulations of the Commissioner prohibited mid-term cancellation on "underwriting" grounds not set forth in the policy. The Commissioner's emergency regulations were subsequently codified at N.J.A.C. 11:1-20.4(b)(1)-(13).
Although our reported cases have not dealt extensively with claims of arbitrary mid-term cancellation, two decisions provide insight on public policy regarding such cancellations. In Weathers v. Hartford Ins. Grp., 77 N.J. 228, 390 A.2d 548 (1978), the insurer tried to effect cancellation of an automobile insurance policy prior to the time the pre-paid coverage period expired. Weathers involved automobile insurance, which is more regulated and contains different notice and cancellation grounds than general liability insurance. Compare N.J.S.A. 17:29C-1 and N.J.S.A. 17:29C-7. The Weathers Court's language regarding mid-term policy cancellations is nonetheless instructive:
We find it nothing short of unconscionable for an insurer to cease providing coverage for which it has already been paid on an arbitrarily selected date prior to the date on which the premium monies in its hands would be exhausted by being fully earned....

*429 By selecting an effective date of cancellation prior to the last full day to which coverage could extend before the premium earned would exceed the premium in its hands, the insurer has acted in a manner injurious to the right of its policyholder to receive the benefits of the insurance contract and thus plainly inconsistent with its fiduciary duty to deal with its insured fairly and in good faith. Bowler v. Fidelity and Casualty Co. of N.Y., 53 N.J. 313, 327 [250 A.2d 580] (1969). In New Jersey today the interests of an insured in possessing automobile insurance coverage for the maximum amount of time for which he has paid a premium are compelling. In its absence, he is exposed to the potential of significant criminal and administrative sanctions[*] substantial civil liability and the possibly devastating consequences of a lack of the first party personal injury protection benefits which are mandatory in this State. Similarly weighty is the public interest that an individual possess the financial protection and responsibility provided by insurance coverage. The interest of the insurer in selecting an earlier time for cancellation of the policy to be effective  mainly that of administrative expedience  is featherweight in comparison. The insurer is being asked only to provide that for which it has already received adequate consideration  coverage under the policy to the full extent of the premium paid. Neither its right to terminate coverage when that point is reached nor its initial right to cancel the policy for nonpayment of the remaining premium due would be affected.
We find something inherently inequitable in allowing an insurer to terminate present coverage for which it has already been paid on the ground that it has not yet been paid for future coverage which it is not yet obliged to provide.
[*] See, e.g., N.J.S.A. 39:6B-2.
In re N.J.A.C. 11:1-20, 208 N.J. Super. 182, 505 A.2d 177 (App.Div. 1986), upheld the constitutionality of the Governor's certification of an insurance emergency and the Commissioner's emergency rule-making and adoption of the regulations. Although this case was decided after Aetna's May 23, 1985 cancellation of Harvester's policy, it drew upon public policy considerations that existed prior to the Commissioner's order.
Specifically, we noted that the Commissioner had initiated emergency rule-making in order to restrict arbitrary mid-term cancellations of general liability policies, prevent reductions in coverage and mid-term price increases, prohibit insurers from cancelling policies held by minority insureds, and require timely notice and specific reasons for the cancellation or non-renewal of policy lines. Id. at 188, 505 A.2d 177. We found the goals of the emergency regulations consistent with N.J.S.A. 17:29AA-1, et seq., stressing that the goal of this statutory provision, enacted in 1982, was to prevent the use of policy "forms that are unfair, inequitable, *430 misleading or contrary to law." 208 N.J. Super. at 197, 505 A.2d 177. We also noted the impact of two bulletins issued by the Department of Insurance[6] that had clarified the retroactive application of the rule only to insurance policies effective on the rule's date of enactment, September 17, 1985, but for wrongful cancellation prohibited by the rule. Id. at 199, 505 A.2d 177.
These two cases comport with the axiom to which our courts have adhered in cases pitting the insured against the insurer: the reasonable expectations of the insured, not the insurer, are to guide judicial construction of insurance policies. Sparks v. St. Paul Ins. Co., supra, 100 N.J. at 338, 495 A.2d 406; Vargas v. Hudson County Board of Elections, 949 F.2d 665 (3d Cir.1991). This construction is appropriate here because, as we have noted, insurance contracts are contracts of adhesion, drafted by the insurer, and by persons well-versed in the niceties of insurance law. Sparks, supra, 100 N.J. at 338, 495 A.2d 406. Like all insureds, Harvester is severely limited in attempting to bargain for more desirable policy provisions, and thus, had to choose between accepting the policy as offered, or face the perils of doing business without insurance coverage.
Hence, we hold that public policy in 1984, foreshadowed in part by N.J.S.A. 17:29AA-11, prohibited arbitrary mid-term cancellation clauses in insurance policies. We find the dicta in Weathers and the reasoning in In re N.J.A.C. 11:1-20 (interpreting the Commissioner's emergency regulations and upholding their retroactivity) persuasive. Weathers did not declare new law. It restated extant public policy which applied not only to automobile insurance policies but also to other forms of liability policies. The ability to arbitrarily terminate an insurance policy mid-term violates the tenets of good faith that Weathers noted was required of insurers. If Aetna's insurance policy cancellation provision was interpreted as Aetna contends, it would allow cancellation on thirty days' notice of paid-up insurance mid-term for unspecified *431 so-called, "underwriting reasons" or no reason, and this would be against public policy. The "for any reason" provision is not sensibly construed to meet the insured's reasonable expectations if the provision is read to mean either for no reason or without valid reason.
Furthermore, the thirty-day notice cancellation clause here does not fulfill the reasonable expectation of Harvester which bargained in November 1984 for one year of insurance coverage. Both the insured (here Harvester) and innocent third-party beneficiaries (such as Manuel Borelly) depend upon insurers to keep their promises of coverage without resorting to a "catch-all" safety valve that permits the insurer to arbitrarily withdraw from its promise before the end of the policy term. Harvester could certainly have had a reasonable expectation that it would have insurance for the policy term and that a cancellation would not be arbitrary or without some objective good cause or reasonable ground.[7]
Although New Jersey now has in effect regulations that govern mid-term cancellations of general liability insurance policies, see, e.g., N.J.A.C. 11:20-1 et seq., the lack of those regulations between November 1984 and September 17, 1985, did not authorize Aetna to unilaterally terminate Harvester's policy mid-term without adequate and objective reasonable grounds.

III.
Despite our resolution of this appeal on contract principles and public policy grounds, we observe that the grant of summary *432 judgment on the cross-motion was improper because there were disputed issues of material fact.[8]
On remand the issue for determination will be whether Aetna had an objective, reasonable ground for the cancellation notice that was sent during the policy term. If the trial court finds that Aetna sent proper notice to Harvester, the court must then consider whether there were objective and reasonable underwriting reasons at the time the notice was sent that did not exist at the inception of the policy. If so, the policy may be considered appropriately cancelled. However if no such reasons existed, or if proper notice was not given, then Harvester was entitled to insurance coverage by Aetna and Harvester is entitled to a judgment declaring coverage of Harvester by Aetna.
*433 Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] The underlying litigation was resolved by a consent judgment in the amount of $500,000 on the liability claim of the tort plaintiff, Manuel Borelly.
[2] Resolution of that issue in Harvester's favor would strengthen the public policy argument because of the adoption of certain emergency insurance regulations between May and November 1985 discussed, infra.
[3] Since non-renewal is not involved here our opinion does not apply to it.
[4] Harvester repaid the loan in timely fashion. To protect its financial interests, AFCO had reserved the right to any unearned premiums in the event the policy was cancelled.
[5] On December 13, 1985, NIA forwarded to AFCO the $3,396 that Harvester owed AFCO and NIA remitted $1,486.58 to Harvester as the unearned premium refund.
[6] Bulletins # 85-1 and 85-2.
[7] An objective "reasonable grounds" standards to measure whether mid-term policy cancellation is justified was required in Unocal Corp. v. Superior Court of the State of California, 244 Cal. Rptr. 540, 547 (Cal. App. 2 Dist. 1988) (not officially published).
[8] We merely note in passing that N.J.S.A. 17:29C-1, applicable in April 1985, lists the notice requirements for general liability and casualty insurance. It provides in part that insurance policies "shall include provisions ... whereby 30 days' notice shall be given ... to the insured, of the notification of the cancellation of [insurance] policy...." N.J.S.A. 17:29C-1. N.J.A.C. 11:1-5.5 (now N.J.A.C. 11:1-5.2) was promulgated by the Commissioner to implement the statute. Although the judge found that Aetna sent proper notice to NIA, Harvester's insurance agent, the motion judge's brief March 8, 1994 letter opinion (submitted after the appeal was filed) is silent as to whether Aetna sent proper notices to Harvester. Notice requirements are designed to prevent a lapse in coverage not only for insureds, but also to protect innocent third parties since lapse of coverage could translate into uncompensated injury that ought rightfully be remunerated. See Meric Trucking Co. v. Philip Lehman Co., 247 N.J. Super. 261, 264-265, 588 A.2d 1285 (App.Div. 1991); Echevarias v. Lopez, 240 N.J. Super. 104, 108, 572 A.2d 671 (App.Div. 1990). The obligation to provide prior notice rests squarely on insurers. Hence, it was Aetna's obligation to notify Harvester of an intent to cancel even if the insurer notified the insurance agent or broker. See Barbara Corp. v. Bob Maneely Ins. Agency, 197 N.J. Super. 339, 346, 484 A.2d 1292 (App.Div. 1984) (insurer liable on insured's claim of loss where it had not provided timely direct notice). Inadequate cancellation notice resulted in the insurer being required to continue coverage for the policy term. See Echevarias v. Lopez, supra, 240 N.J. Super. at 108, 572 A.2d 671; Barbara Corp., supra, 197 N.J. Super. at 346, 484 A.2d 1292. Even proof of mailing of cancellation notices of general liability policies does not conclusively establish the required notice. Weathers v. Hartford, supra, 77 N.J. at 234, 390 A.2d 548; see Needham v. N.J. Ins. Underwriting Ass'n, 230 N.J. Super. 358, 371, 553 A.2d 821 (App.Div. 1989); State v. Hochman, 188 N.J. Super. 382, 388, 457 A.2d 1156 (App.Div. 1982).